Daniel Low (Bar #218387)
**KOTCHEN & LOW LLP**
1918 New Hampshire Avenue NW
Washington, DC 20009
Telephone: (202) 471-1995
Fax: (202) 280-1128
Email: dlow@kotchen.com

*Attorney for Plaintiffs and Putative Class*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| SCOTT TAUB and SOFIA BRANDER, <br><br> Plaintiffs, <br><br> v. <br><br> TESLA, INC., <br><br> Defendant. | Case No. 25-7785 <br><br> **COMPLAINT** <br><br> FOR EMPLOYMENT DISCRIMINATION <br><br> CLASS ACTION <br><br> DEMAND FOR JURY TRIAL |

Plaintiffs Scott Taub and Sofia Brander bring this action on behalf of themselves and a class of similarly situated individuals to remedy pervasive, ongoing citizenship discrimination by Defendant Tesla, Inc. ("Tesla") and allege as follows:

## NATURE OF THE ACTION

1.    Tesla is an American multinational automotive and clean energy company that was founded in 2003. It designs, manufactures, and sells electric vehicles, energy generation and storage products, and solar panels, and is also known for its innovative automobile technologies, including Autopilot and its Full Self-Driving (Supervised) features.

2.      Tesla employs over 120,000 individuals globally, approximately 70,000 of whom are located in the United States. These employees are staffed in a variety of roles, including engineering, manufacturing, design, sales, customer service, finance, information technology, and Human Resources roles.

3.      When hiring for open positions, Tesla considers United States citizens, lawful permanent residents (e.g., green card holders), and foreign applicants with proper work permits (generally those with H-1B visas, which are reserved for workers in specialty occupations who hold a Bachelor's degree or equivalent experience). But while visa workers make up just a fraction of the United States labor market, Tesla prefers to hire these candidates over U.S. citizens, as it can pay visa-dependent employees less than American employees performing the same work, a practice in the industry known as "wage theft." When Tesla does hire U.S. citizens, it disfavors those employees in its employment decisions and terminates them at disproportionate rates compared to their visa-dependent counterparts.

4.      Tesla's hiring and termination practices—which discriminate against U.S. citizens on the basis of their citizenship—violate the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981 ("§ 1981"). Plaintiffs seek, on their own behalf, and on behalf of a class of similarly situated individuals, declaratory, injunctive, and other equitable relief, compensatory and punitive damages, including pre- and post-judgment interest, attorneys' fees, and costs to redress Tesla's pervasive pattern and practice of citizenship discrimination.

## **PARTIES**

5.      Plaintiff Scott Taub is a United States citizen, and is a resident of Nevada. He is a member of a protected class, as recognized by § 1981.

6.      Plaintiff Sofia Brander is a United States citizen, and is a resident of California. She is also a member of a protected class, as recognized by § 1981.

7.      Defendant Tesla, Inc. is an American automotive and clean energy company, and is one of the world's most valuable automakers. It is headquartered in Austin, Texas and incorporated

in that State.[1] Tesla maintains a number of factories and Gigafactories in the U.S. and abroad, as well as storefronts and showrooms where it sells its products directly to customers.

## JURISDICTION

8.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1981(a).

9.      This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d) as this matter is a class action with an amount in controversy of greater than $5 million, exclusive of interest and costs, and involves at least one member of the class of plaintiffs who is a citizen of a state and is brought against a corporation that is a citizen of a different state.

10.     This Court has personal jurisdiction over Tesla because it engages in continuous and systematic business contacts within the State of California and maintains a substantial physical presence in this State, including the operation of its Engineering Headquarters in Palo Alto (which focuses on engineering, AI, and research), a manufacturing factory in Fremont (where Tesla's Model S, Model 3, Model, X, and Model Y automobiles are produced), a battery development and testing facility in San Diego, a Megapack production and vehicle castings factory in Lathrop, a vehicle design studio in Hawthorne, and a battery development and pilot production factory in Fremont (known as "Kato Road"). Tesla also maintains a number of other offices, warehouses, stores, and showrooms throughout the state. Additionally, as described below, Plaintiffs' claims arise, in part, out of Tesla's activities in California.

## VENUE

11.     Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391 because Tesla resides in this District, conducts business in this District, and engages in discriminatory conduct in this District. Additionally, Tesla engages in continuous and systematic business contacts within this District, and maintains a substantial physical presence in this District, including the operation of its Engineering Headquarters in Palo Alto, an automobile manufacturing factory in

---

[1] Tesla was previously incorporated in Delaware, but moved its state of incorporation to Texas in June 2024.

Fremont (one of the largest manufacturing sites in California), and a battery development and pilot production factory in Fremont. There are also a number of Tesla stores and showrooms where Tesla automobiles are sold in this District, along with Tesla service centers where Tesla vehicles can be serviced or repaired.

## DIVISIONAL ASSIGNMENT

12.    Assignment in this Division is proper pursuant to Civil L.R. 3-2(c) because a substantial part of the events giving rise to this matter's claims occurred in this Division. Specifically, all of the job roles with Tesla that Plaintiffs applied to, and were rejected for, were located in this Division (i.e., in Palo Alto, Fremont, and Pleasanton, California).

## STATEMENT OF FACTS

*Overview of Tesla's Business Model and Discriminatory Scheme*

13.    Tesla's business focuses on two distinct segments: (1) automotive and (2) energy generation and storage. In the automotive segment, Tesla designs, manufactures, and sells high-performance electric vehicles ("EVs"), including the Model S, Model 3, Model X, Model Y, Cybertruck, Roadster, and Tesla Semi vehicles, and also offers services related to those products (e.g., maintenance and repairs, sales of used vehicles, parts sales, paid Supercharging, etc.). In the energy generation and storage segment, Tesla designs, manufactures, sells, installs, and leases energy generation and storage products, including Powerwall (a home battery sold directly to customers that is used to store energy), Megapack (a utility-scale battery which serves as an energy storage solution for commercial, industrial, utility, and energy customers), and solar panels.

14.    Tesla's products are developed by teams of designers, engineers, and modelers who work out of one of Tesla's facilities, including its global headquarters in Austin, Texas (a major design hub for vehicles and other products), Engineering Headquarters in Palo Alto, and design studio in Hawthorne.

15.    Tesla manufactures its automobiles and other products at eight factories, six of which are located in the United States—an automobile manufacturing factory in Fremont, California; a battery development factory in Fremont, California; a Gigafactory in Sparks, Nevada which

4
COMPLAINT

manufactures electric motors, energy storage products, and vehicle powertrains and batteries; a Gigafactory in Austin, Texas, which is a manufacturing hub for the Model Y and Cybertruck vehicles; a battery production and solar panel manufacturing Gigafactory in Buffalo, New York; and a Megafactory in Lathrop, California which focuses on building Megapacks (utility-scale batteries). Tesla also has automobile and battery manufacturing factories located in Shanghai, China and Berlin, Germany.

16.    Tesla primarily sells its products directly to consumers through its online platform and company-owned stores and showrooms. Tesla maintains approximately 280 stores and galleries in the United States and also maintains service centers, super chargers, and collision centers across the U.S.

17.    Tesla earned $97.69 billion in total revenue for fiscal year 2024. Approximately 79% of Tesla's total revenue was derived from its automotive segment, with approximately 10% of its revenue generated from energy generation and storage (another 10% of Tesla's revenue is derived from services and other revenue).

18.    Over the past five years, Tesla has experienced rapid growth within the U.S. and is widely recognized as the leader in the EV market. Tesla's Model Y, a compact sport utility vehicle, was the world's best-selling automobile in 2023, and was the top-selling EV in the U.S. in 2024 (where it placed as the fourth best-selling car in the United States across all makes and models, selling 405,900 units).

19.    Tesla's growth in the U.S. has been fueled, in part, by its focus on expanding its production capacity. In 2020, Tesla began production of its Model Y automobile, and in April 2022, Tesla opened its Austin, Texas Gigafactory. That same year, Tesla also began production of its first commercial electric vehicle, the Tesla Semi, and also significantly expanded its footprint in California, including by opening its Megafactory in Lathrop. The following year, Tesla established its global Engineering Headquarters in Palo Alto, California.

20.    In order to support its rapid growth in the U.S., Tesla has hired thousands of employees domestically to support its design, manufacturing, and sales of Tesla products. In 2021, Tesla

employed approximately 57,946 employees in the United States, and its headcount has now grown to over 70,000 employees. These workers are staffed in a variety of design, engineering, manufacturing, information technology, sales, administrative, Human Resources, and other roles.

21.    In its U.S. hiring decisions, Tesla prefers to hire non-citizen visa workers—namely, H-1B visa workers—who it slots into specialized roles in engineering, research, and design. In doing so, Tesla discriminates against U.S. citizens in its hiring practices.

22.    H-1B visas are intended to bring foreign workers to the United States to perform services in specialty occupations when there are insufficient workers in the U.S. to perform a specific job. *See* 8 C.F.R. § 214.2(h)(1)(ii)(B); 8 C.F.R. § 214(i)(1). Specialty occupations are those that require a Bachelor's degree or higher (or its equivalent), and include job roles in the fields of engineering, manufacturing, software development, and IT (among others). By law, H-1B visa workers must be paid by their employer at least as much as other individuals with similar experience and qualifications for the specific employment in question. *See* 20 C.F.R. § 655.731(a). However, despite this wage requirement, Tesla prefers to hire visa employees over U.S. citizens, despite their availability in the labor market, as it can—and does—pay them less than American workers, an unlawful practice known as "wage theft." Tesla is able to underpay visa workers because unlike U.S. citizens (and other lawful permanent residents), visa employees require Tesla's sponsorship to remain in the United States. If a visa employee is fired by Tesla, or resigns from the company, he or she must quickly secure visa sponsorship from another employer or else the employee must return to his or her home country. Because obtaining new visa sponsorship is a difficult task, visa employees are often indentured to their employer, and are less likely to speak out against undesirable working conditions, such as long hours or underpayment.

23.    Tesla applicants can apply to the company directly on Tesla's career website. In addition to gathering candidates' resumes, education, and work experience, Tesla's online applications also require candidates to disclose whether they now or in the future require immigration sponsorship for employment with Tesla. Accordingly, Tesla's applications directly solicit information from candidates concerning their visa status/citizenship.

24.     Tesla also recruits and hires candidates from the marketplace using its own recruiters and also third-party vendors that provide Tesla with prospective candidates for hire. On information and belief, Tesla's own recruiters specifically seek out and hire visa workers directly from the U.S. labor market and also favor visa workers supplied by Tesla's third-party vendors, who Tesla hires and employs. After hiring a local visa worker, Tesla then transfers the employee's visas to Tesla in order to allow them to legally work in the U.S. for Tesla.

25.     Tesla further utilizes third-party vendors such as Max Eleven, West Valley Staffing, ManPower, Balance Staffing, Nelson Staffing, and others that provide it with visa workers to work out of Tesla's facilities as contractual employees of Tesla. While the consulting or contracting companies sponsor the visas for these employees, Tesla interviews the workers, maintains control over their hiring and termination, and supervises and directs their day-to-day activities and work. As such, there is a joint employment relationship between Tesla and employees of its third party staffing vendors.

26.     The United States government issues only 65,000 new H-1B visas each year (another 20,000 H-1B visas are reserved for individuals with graduate degrees from American Universities). Because of this cap, visa workers make up just a fraction of the U.S. workforce (approximately 0.37% of the overall U.S. workforce is on an H-1B visa, and 0.95% of the overall U.S. workforce with at least a Bachelor's degree is on an H-1B visa).[2] However, Tesla prefers to hire, staff, and supervise

---

[2] As of September 2019, there were approximately 583,420 H-1B visa holders in the United States. *See* Priyanka Sangani, US has just over 580,000 H-1B holders, says USCIS, THE ECONOMIC TIMES (June 29, 2020), https://economictimes.indiatimes.com/nri/visa-and-immigration/us-has-just-over-580000-h-1b-visa-holders-says-uscis/articleshow/76676250.cms?from=mdr. The total U.S. workforce in 2019 was approximately 157.54 million. *See* Employment in the United States from 2013 to 2023, STATISTA (last accessed Feb. 25, 2025), *available at* https://www.statista.com/statistics/269959/employment-in-the-united-states/. Approximately 38.9% of the U.S. workforce held at least a bachelor's degree in 2016, though that percentage has presumably increased. *See* Vernon Brunage, Jr., Profile Of The Labor Force By Educational Attainment at 2, BUREAU OF LABOR STATISTICS (August 2017), https://bit.ly/4hTJOfz (reporting that in 2016, 24.2% of the labor force had only a bachelor's degree, and 14.7% had an advanced degree, or 38.9% with a bachelor's degree or higher). Thus, approximately 0.37% of the workforce in 2019 consisted of H-1B visa holders (i.e., 583,420 ÷ 157.54 million), and approximately 0.95% of the workforce in 2019 with at least a bachelor's degree consisted of H-1B visa holders (583,420 ÷ (157.54 million x 38.9%)).

visa employees for U.S. roles, and as such, relies heavily on the U.S. visa system for hiring and staffing purposes.

27.    From 2018 to 2024 (a six-year period), Tesla secured over 5,400 H-1B visas (including new H-1B visas, visa extensions, and visa amendments). And, as Tesla's U.S. workforce continues to grow, so does its reliance on H-1B visa workers, as indicated by the increased number of H-1B visa approvals below.

| Year | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|------|------|------|------|------|------|------|------|
| H-1B Visa Approvals[3] | 401 | 638 | 649 | 880 | 1,108 | 497 | 1,293 |

Notably, these figures do not include the H-1B visas that Tesla's third party staffing vendors, such as Max Eleven, West Valley Staffing, ManPower, Balance Staffing, Nelson Staffing, and others, file and obtain on behalf of the contractual employees that they supply to Tesla for staffing purposes. These figures also do not include what are referred to as non-cap H-1Bs (also known as cap-exempt H-1B visas) which are exempt from the 65,000 annual lottery cap. When Tesla hires an employee from the local market who already has an approved, valid visa, and then transfers that employee's H-1B visa to Tesla, that visa is considered non-cap and is not reported in the data published annually by U.S. Citizenship and Immigration Services (the figures reflected in the above chart).

28.    Prior to 2024, Tesla was not a top 25 recipient of H-1B visas, but in 2024, it ranked 16th overall in receipt of initial petitions, receiving approximately 745 new H-1B visas from the U.S. government (along with 548 H-1B visa extensions or amendments that same year[4]). Tesla also transferred 610 H-1B visa workers' visa sponsorship to Tesla from other employers (non-cap H-1B visas), resulting in Tesla hiring a total of over 1,350 new H-1B visa employees that year. At the same time Tesla applied for these visa applications, it laid off more than 6,000 workers across the United States. On information and belief, Tesla laid off these workers, the vast majority of whom are U.S.

---

[3] *See* H-1B Employer Datahub, U.S. CITIZENSHIP AND IMMIGRATION SERVICES (last accessed Sept. 12, 2025), *available at* https://www.uscis.gov/tools/reports-and-studies/h-1b-employer-data-hub.

[4] While this is the figure reported by USCIS, news outlets have reported that Tesla in fact sought 1,043 visa amendments and/or extensions.

citizens, so that it could replace them with non-citizen visa workers (its preferred group of employees).

29.    H-1B visas are valid for an initial period of three years, which can be extended one time for an additional three-year period. In order to ensure that non-citizen hires can remain employed by Tesla beyond this six-year period, Tesla seeks green cards on its H-1B visa employees' behalf prior to the expiration of their visas. A crucial step in obtaining an employee's green card is submitting a PERM application, also known as a Permanent Labor Certification, to the Department of Labor. Tesla's PERM applications again demonstrate the company's continued reliance on visa workers.

| Year | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|------|------|------|------|------|------|------|------|
| PERM Applications[5] | 200 | 118 | 210 | 141 | 165 | 60 | 298 |

30.    Tesla does not go to the same lengths, however, to retain its U.S. citizen workers. As evidenced by Tesla's recent layoffs in 2024, and H-1B visa filings that same year, Tesla prefers to employ and retain visa employees in its U.S. workforce and U.S. citizens are disfavored in retention/termination decisions and are more likely than their visa-dependent counterparts to be terminated or laid off by the company.

31.    Tesla's co-founder and CEO, Elon Musk has strongly defended Tesla's reliance on the H-1B visa program to source labor. In a December 27, 2024 post on X, the social media platform formerly known as Twitter, Mr. Musk responded to recent scrutiny concerning the H-1B visa program and its harm to American workers, as follows:

---

[5] *See* Performance Data, U.S. DEPARTMENT OF LABOR (last accessed Sept. 12, 2025), *available at* https://bit.ly/3HP5KpF.

COMPLAINT



The reason I'm in America along with so many critical people who built SpaceX, Tesla and hundreds of other companies that made America strong is because of H1B.

Take a big step back and FUCK YOURSELF in the face. I will go to war on this issue the likes of which you cannot possibly comprehend.

11:22 PM · 12/27/24 · **59K** Views

*Plaintiff Taub's Experiences*

32.    Mr. Taub is a Technical Quality Assurance/DevOps/SDET/Test Manager professional with over twenty years of experience in Lead and Management roles. He has a number of relevant certifications, including e.g., SCO UNIX System Administrator, SCO TCP/IP, Informix DBA, C Programming, Structured Programing, and Local Area Networks. Mr. Taub is experienced in PC's mainframes and servers, is skilled in systems set up and maintenance, and has worked with a number of non-propriety QA tools throughout his career. Most recently, Mr. Taub worked as a consultant for CNH Industrial as a Python Test Robotics Engineer.

33.    On September 15, 2023, Mr. Taub was contacted by Aditya Sainik, a Senior Technical Recruiter from Max Eleven, a third-party staffing vendor for Tesla. Mr. Sainik was recruiting for a QA Automation Engineer role servicing Tesla for 6+ months. This was a joint employer / contractual employee role to be located in Fremont, California. Mr. Taub readily met the qualifications for the

COMPLAINT

QA Automation Engineer role as he is experienced with Python programming and writing test scripts, is knowledgeable of relational databases, including SQL, and has experience working with client-server architectures and automation (among other skills and experience).

34.    Mr. Sainik's email stated that the interview process would consist of 1-2 rounds, each anticipated to last 45 minutes or so, and would involve 110-120 minutes of coding with a 65% overall pass rate required for each section. The email also bluntly stated that the Tesla position was for "H1B only" and that "Travel history/i94 are a must" (i.e., proof of legal entry into the U.S.).

35.    Mr. Taub was shocked to read that the role with Tesla had been reserved for H-1B visa employees and that he would not be seriously considered for the QA Automation Engineer role because he is a U.S. citizen. While Mr. Taub was very interested in the QA Automation Engineer role, because the position was reserved for "H1B only," Mr. Taub was dissuaded from applying to it, knowing that any such application would be futile and that he would not be hired because of his citizenship.

36.    On August 29, 2025, Mr. Taub applied for a Software QA Engineer, Infotainment, Vehicle Software position (Requisition ID 249680) with Tesla on its career website. The advertised position was a full-time role with Tesla in Palo Alto, California that focused on User Interface Software. As part of the application, Tesla asked Mr. Taub whether he would require sponsorship for employment with the company at that time or in the future. Mr. Taub answered "No" to this question, as he is a U.S. citizen.

37.    Mr. Taub was well-qualified for the role, given his prior experience in software testing and automation scripting. However, despite his qualifications, Mr. Taub was not interviewed nor hired for the role. On September 4, 2025, just six days after Mr. Taub applied to the Software QA Engineer role on Tesla's career website, he received an email from Tesla, informing him that it was not moving along with his application at this time. Mr. Taub was not hired by Tesla because of his citizenship, and Mr. Taub would have been hired absent Tesla's systematic preference for visa workers in hiring.

38.     Mr. Taub was a victim of Tesla's ongoing discriminatory scheme whereby he was not hired the Software QA Engineer position with Tesla, and was barred from applying to the QA Automation Engineer role, because he is a U.S. citizen and is not a visa employee. Upon information and belief, Tesla reserved these positions (and others) for visa workers in line with its systematic preference for visa holders in hiring for U.S. positions.

*Plaintiff Brander's Experiences*

39.     Ms. Brander is a Human Resources ("HR") Specialist who holds a B.A. in Sociology from the University of California, Los Angeles. She has eight years of professional experience in Human Resources and is experienced in the administration of employee benefits, ensuring policy compliance, fostering positive workplace relations, and supporting managers and employees across multiple lines of business. Ms. Brander is skilled in a number of Human Resources Information Systems ("HRIS") platforms including PeopleSoft, ServiceNow, Workday, Infor, EaseCentral, and SalesForce. She has worked for Tesla on two occasions, from November 2017 to December 2017, and from September 2018 to November 2018, as a contractual employee, acting as a HR Benefits Specialist and Inside Sales Advisor, respectively. The staffing agency that employed Ms. Brander in these contractual positions (joint employer / contractual employee roles) was aware that she is a U.S. citizen.

40.     Ms. Brander applied to two full-time positions with Tesla in 2023 and 2024, but Tesla failed to hire her on both occasions because the company's systematic and continuous discriminatory scheme which favors visa employees and disfavors U.S. citizens in hiring.

41.     Specifically, on June 12, 2023, Ms. Brander applied to a HR Coordinator role with Tesla located in Fremont, California (Requisition ID 185572). Ms. Brander applied for the role on Tesla's career website, and, as part of her application, disclosed that she did not, nor would she in the future, require sponsorship from Tesla to work in the United States. On information and belief, because of this disclosure, and because Ms. Brander previously worked for Tesla as a contractual employee, Tesla knew that Ms. Brander was a United States citizen at the time of her application.

42.     The posting for the HR Coordinator role stated that the individual hired would support the HR team and work with employees across the business. Ms. Brander was well-qualified for the role, as she was experienced in working with HR team members and employees, and had considerable prior experience in ensuring compliance with company policies, pulling reports from HRIS systems, and working to improve the employee experience. Ms. Brander also met the educational requirements for the role (a Bachelor's degree) and while the position required 2-3 years of prior experience in HR or recruiting, Ms. Brander exceeded this requirement. Further, because Ms. Brander had previously worked for Tesla on two occasions as a contractual employee through West Valley Staffing, she had demonstrated to the company her competence and ability to perform multiple HR roles.

43.     Tesla's job application also contained a section titled "Evidence of Excellence," where Ms. Brander was allowed to add additional information in support of her candidacy. On that portion of the application, Ms. Brander wrote "B.A. from UCLA[.] I've worked at Tesla twice. Fluent in Spanish: speak, read, and write."

44.     However, despite Ms. Brander's qualifications for the HR Coordinator role, Tesla never contacted nor interviewed Ms. Brander for the position and Ms. Brander was not hired by Tesla.

45.     On August 10, 2024, Ms. Brander applied to a HR Coordinator, Production role with Tesla. Ms. Brander again applied to the position on Tesla's career website and disclosed as part of her application that she did not require sponsorship to work in the United States. Despite being well-qualified for the role, given her considerable HR experience, including having held multiple HR Coordinator roles previously and having previously worked for Tesla, the only communication Ms. Brander received from Tesla was an email confirming receipt of her application. She received no further outreach from Tesla and was not interviewed nor offered the HR Coordinator role.

46.     In both instances, Tesla did not hire Ms. Brander because of her citizenship, and Ms. Brander would have been hired absent Tesla's systematic preference for visa holders in hiring for U.S. roles. Like Mr. Taub, Ms. Brander was a victim of Tesla's ongoing discriminatory scheme whereby she was not hired for two permanent positions within the company that—upon information and belief—Tesla instead reserved for visa workers.

## CLASS ACTION ALLEGATIONS

47.     Plaintiffs bring this Class Action pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), (b)(3), and (c)(4), seeking injunctive, declaratory, equitable, and monetary relief for Tesla's systematic pattern and practice of discrimination against U.S. citizens and non-visa-dependent individuals in the United States. This action is brought on behalf of the following class:

> All individuals who are U.S. citizens and either applied for roles with Tesla in the U.S., either directly or through a third party vendor, and were not hired or who worked for Tesla in the U.S., either directly or through a third party staffing vendor, and were fired.

48.     Members of the class are so numerous and geographically dispersed across the United States that joinder is impracticable. While the exact number of class members is unknown to Plaintiffs, it is believed to be in the thousands. Furthermore, class members are readily identifiable from information and records in Tesla's possession.

49.     There are numerous questions of law and fact common to members of the class. Among the common questions of law or fact are:  (a) whether Tesla has intentionally discriminated against individuals who are not visa workers (i.e., U.S. citizens) in making hiring and termination/retention decisions; (b) whether Tesla has intentionally favored visa workers in hiring and termination/retention decisions, and/or whether Tesla has intentionally disfavored non-visa workers (i.e. U.S. citizens) in hiring and termination/retention decisions; (c) whether Tesla's policy and practice of relying on visa workers for U.S. employment is intentionally discriminatory; (d) whether Tesla has violated § 1981; (e) whether equitable and injunctive relief is warranted for the class; and (f) whether compensatory and/or punitive damages are warranted for the class.

50.     Plaintiffs' claims are typical of the class. Members of the class were damaged by the same discriminatory employment practices which favor visa employees and disfavor U.S. citizens across roles.

51.     Plaintiffs will fairly and adequately protect the interest of other class members because they have no interest that is antagonistic to or which conflicts with those of any other class member, and Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel experienced in class litigation to represent Plaintiffs and the class.

52.     Plaintiffs and the class they seeks to represent have suffered substantial losses in earnings and other employment benefits and compensation as a result of Tesla's actions.

53.     Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(2) because Tesla has acted and/or refused to act on grounds generally applicable to the class, making declaratory and injunctive relief appropriate with respect to Plaintiffs and the class as a whole. Members of the class are entitled to declaratory and injunctive relief to end Tesla's systematic, common, uniform, unfair, and discriminatory employment policies and practices.

54.     Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(3) because the issue of liability is common to the class and the common nucleus of operative facts forms the central issue, which predominates over individual issues of proof. The primary question common to the class is whether Tesla has discriminated on the basis of citizenship in its hiring and firing practices. This question is central to the case and predominates over individual issues among the members of the proposed class. Tesla has engaged in a common course of discriminatory conduct in a manner that has harmed all class members. Class certification under Rule 23(b)(3) would be superior to other methods for fair and efficient resolution of the issues because certification will avoid the need for repeated litigation by each individual class member. The instant case will be eminently manageable as a class action. Plaintiffs know of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

55.     Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(c)(4) to litigate Plaintiffs' claims for prospective classwide compliance and affirmative injunctive relief necessary to eliminate Tesla's discrimination. Certification under this rule is also appropriate to decide whether Tesla has adopted a systemic pattern and practice of citizenship discrimination in hiring and its retention/termination decisions. Certification under this rule is also appropriate to determine classwide damages, including punitive damages.

### COUNT I
**Disparate Treatment on the Basis of Citizenship in Violation of 42 U.S.C. § 1981**
**(On behalf of Plaintiffs and the Class)**

56.     Plaintiffs re-allege each preceding paragraph as though fully set forth herein.

57.     This claim is brought by Plaintiffs on behalf of themselves and the class.

58.     Throughout the class liability period, Tesla has engaged in a pattern and practice of discriminating against U.S. citizens (who are not visa workers) by: (a) knowingly and intentionally favoring individuals reliant on visas in job placement (*i.e.*, hiring/staffing) decisions and retention/termination decisions, and (b) knowingly and intentionally disfavoring U.S. citizens, including Plaintiffs (who are not visa workers) in job placement (*i.e.*, hiring/staffing) decisions and retention/termination decisions.

59.     As a direct and proximate result of Tesla's intentional discrimination, Plaintiffs and class members have been denied employment and positions with Tesla and have been denied continued employment with the company. And but for Plaintiffs and class members' U.S. citizenship, they would have been hired by Tesla, and would not have been denied employment and positions with Tesla and would not have been terminated by the company.

60.     Tesla's actions constitute unlawful discrimination on the basis of citizenship in violation of 42 U.S.C. § 1981.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and the class pray for relief as follows:

a.     Certification of the case as a class action pursuant to Fed. R. Civ. P. 23;

b.     Designation of Plaintiffs as representative of the class;

c.     Designation of Plaintiffs' counsel as counsel for the class;

d.     A declaratory judgment that the practices complained of herein are unlawful and violates the Civil Rights Act of 1866, 42 U.S.C. § 1981;

e.     A permanent injunction against Defendant and its officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in unlawful policies, practices, customs, and usages set forth herein;

f.     Order Defendant to adopt a valid, non-discriminatory method for hiring, staffing, and other employment decisions;

g.     Order Defendant to post notices concerning its duty to refrain from discriminating against applicants and employees on the basis of citizenship;

h.      Award Plaintiffs and the Class damages – including (without limitation) compensatory, exemplary, and punitive damages for the harm they suffered as a result of Defendant's violations of § 1981;

i.      Award Plaintiffs and the Class pre- and post-judgment interest at the prevailing rate on the compensatory damages as a result of Defendant discriminating against them in violation of § 1981;

j.      Award Plaintiffs and the Class front- and back-pay, instatement, and such other equitable relief as the Court deems just and appropriate;

k.      Award reasonable attorneys' fees, expert witness fees, expenses, and costs of this action and of prior administrative actions; and

l.      Award Plaintiffs and the Class such other relief as this Court deems just and appropriate.

## JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. 38, Plaintiffs and the Class respectfully demand a trial by jury on all issues properly triable by a jury in this action.


DATED:    September 12, 2025             Respectfully submitted,

By: /s/Daniel Low
Daniel Low, SBN 218387
**KOTCHEN & LOW LLP**
1918 New Hampshire Avenue NW
Washington, DC 20009
Telephone: (202) 471-1995
Email: dlow@kotchen.com


*Attorney for Plaintiffs and Putative Class*